Albert C. WALL, Plaintiff,

v.

PENNZOIL–QUAKER STATES
COMPANY, a Delaware
Corporation, Defendant.

No. 0214160CIVPAINE Lynch.

United States District Court,
S.D. Florida.

Jan. 27, 2004.

Joseph L. Mannikko, Mannikko & Baris, Palm City, FL, for Plaintiff.

Karen Ann Brimmer, Hinshaw & Culbertson, Fort Lauderdale, FL, Ralph Colby Losey, Stephanie Ann Segalini, Katz Kutter Alderman Bryant & Yon, Orlando, FL, for Defendants.

## ORDER ADOPTING REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE AND ENTERING SUMMARY FINAL JUDGMENT

PAINE, District Judge.

This matter is before the court on a Report and Recommendation issued by the Honorable Frank J. Lynch, Jr. on January 12, 2004 (D.E.# 106). The court has received the objections filed by plaintiff Wall, and has considered said objections in its analysis of Judge Lynch's recommendation. Upon independent and *de novo* review of the file, the court finds that the recommendation is supported by the law.

The court finds that Judge Lynch made thorough and accurate findings regarding the history of this ERISA case. Applying the appropriate law to these findings, Judge Lynch ultimately concluded that summary judgment should be entered in favor of both defendants on Count I and

that summary judgment should be entered in favor of defendant PENNZOIL on Count II.

The court has reviewed plaintiff's objections to said recommendations[1] and disagrees with plaintiff's characterization of the operative benefits plans and the authority to make determinations under same. Specifically, the court disagrees with plaintiff's contention that the determination of benefits eligibility should be *de novo*. Rather, in keeping with *Parness v. Metropolitan Life Ins. Co.*, 291 F.Supp.2d 1347 (S.D.Fla.2003), as outlined in the R & R, the court is limited to the record that existed at the time the final decision regarding benefits eligibility was made. As such, the court is in agreement with Judge Lynch's determination that defendant PENNZOIL's decision to deny long-term disability benefits to plaintiff was reasonable and based on evidence. Accordingly, it is

ORDERED AND ADJUDGED that the Report and Recommendation issued by Judge Lynch is hereby ADOPTED in its entirety. It is further

ORDERED AND ADJUDGED as follows:

1. Defendant MetLife's Motion for Summary Judgment (D.E.# 58) is GRANTED;

2. Defendants PENNZOIL and its Employee Disability Benefit Plan's Motion for Summary Judgment (D.E.# 67) is GRANTED;

3. Plaintiff's Motion for Summary Judgment (D.E.# 64) is DENIED;

4. Summary Final Judgment on Count I of the Second Amended Complaint is entered in favor of all Defendants. Summary Final Judgment on Count II of the Second Amended Complaint is entered in favor of defendant PENNZOIL.

5. This case is CLOSED and any pending motions not otherwise ruled upon are dismissed as moot.

## *REPORT AND RECOMMENDATION ON DEFENDANT METROPOLITAN LIFE'S MOTION FOR SUMMARY JUDGMENT (DE 58), PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DE 64), AND DEFENDANT PENNZOIL'S MOTION FOR SUMMARY JUDGMENT (DE 67)*

LYNCH, Unite States Magistrate Judge.

**THIS CAUSE** comes before this Court upon an Order of Reference from the Hon-

---

1. The court discerns plaintiff's objections to be as follows: (1) The R & R fails to recognize the existence of the Employees Disability Benefit Plan of Pennzoil Company and Participating Subsidiaries, effective January 1, 1977; (2) The R & R failed to properly recognize an Administrative Committee as administrator of the Plan; (3) The R & R failed to recognize that the SPD identifies 7 different benefit plans, which are all administered differently; (4) The 1999 Employees Disability Benefit is the "Plan" and not the "Plan Document;" (5) The Committee remained the Plan Administrator, not Pennzoil; (6) MetLife had no authority to issue final decisions terminating long-term disability benefits; (7) Dates regarding Wall's reapplication for Social Security benefits are incorrect; (8) Plaintiff objects to the findings regarding the videotape of plaintiff; (9) Dr. Gogan's conduct was an adequate and appropriate response to the request for video review; (10) There is no indication that Dr. St. Clair is an "independent physician;" (11) The determination of benefits eligibility should be *de novo;* (12) The Plan did not provide for a second level of appellate review; (13) The actual decision-maker did not act, while MetLife acted without authority; and, (14) MetLife made the final decision to deny benefits/evidence thereto was misapplied; (15) The R & R ignores the contract provisions noting that entitlement, payment and calculations are resolved by the contract.

orable James C. Paine for a Report and Recommendation on the above Motions. Having reviewed the Motions, the various responses, replies, and other related filings, as well as the administrative record, and having held a hearing thereon on November 24, 2003, this Court recommends as follows:

## BACKGROUND

1. The Plaintiff in this action, Albert Wall ("WALL"), has filed suit seeking employee welfare benefits under the Employee Retirement Income Security Act, 29 U.S.C. § 1001, et seq., as amended ("ERISA"). Plaintiff seeks to continue his long term disability ("LTD") benefits under the ERISA plan maintained by his employer, the Pennzoil Company.

2. WALL initially made his claim for LTD benefits in 1990, when his employer offered LTD benefits under the ERISA plan then entitled the "Employee's Disability Benefit Plan." The Plan documents in existence at the time of WALL's initial claim for LTD benefits were as follows:

  (a) The Plan document for the Pennzoil Company effective January 1, 1989 ("1989 LTD Plan Document").

  (b) The Administrative Services Agreement between Pennzoil and Metropolitan Life Insurance Company ("MET LIFE") signed on June 7, 1989 and April 27, 1990.

  (c) The ERISA and LTD portion of the Summary Plan Description for the Plan dated 1–89 ("1989 SPD").

  (d) The Employee's Disability Trust Agreement of Pennzoil and participating subsidiaries effective January 1, 1977 ("1977 Trust Agreement").

3. The Plan identified Pennzoil as the Plan Administrator and Plan Sponsor and identified MET LIFE as the Claims Administrator. Pennzoil also retained final authority to approve or deny claims and specified that MET LIFE's evaluation of claims was "subject to a full and fair review" by the Plan. The Plan established a trust fund into which contributions were made by Pennzoil, other company organizations adopting the Plan, and eligible employees. The Plan is funded through this trust fund. In other words, the Plan is self-funded, and MET LIFE is not financially liable for the long term disability benefits.

4. Pursuant to the 1989 SPD, an administrative procedure was established whereby Pennzoil authorized MET LIFE to conduct the initial claim investigation and to issue a written benefit decision to the claimant. MET LIFE was also to conduct the first level of appeal, and if it upheld an unfavorable decision, then the claimant could appeal to Pennzoil for further review.

5. The Plan paid WALL benefits from May 23, 1990 to February 28, 2002 when his claim was terminated. In 1993, Pennzoil issued a new Summary Plan Description for its plan ("1999 SPD"), which is substantially similar to the 1989 SPD in its terms and conditions relating to the LTD portion of the Plan. WALL points out that copies of these SPD's found in the administrative record provide information relating to benefit plans other than the subject LTD Plan.

6. Prior to the termination of WALL's benefits, the Pennzoil Company became known as Pennzoil–Quaker State Company ("PENNZOIL"), and the PENNZOIL Long Term Disability Benefit Plan became known as the "Employee's Disability Benefit Plan". A new set of Plan documents went into effect in 1999:

  (a) The Employee's Disability Benefit Plan of PENNZOIL and participating subsidiaries, effective January 1, 1999 ("1999 LTD Plan Document").

(b) The PENNZOIL Employee's Disability Trust Agreement, effective January 1, 1999 ("1999 Trust Agreement").

(c) The ERISA and LTD portion of the Summary Plan Description for the Employee's Disability Benefit Plan, dated 1–98 ("1998 SPD").

7. With this new set of Plan documents, PENNZOIL and MET LIFE retained their original ERISA duties— PENNZOIL remained the Plan Administrator and Sponsor and MET LIFE as Claims Administrator. The 1999 LTD Plan Document also established that the Board of Directors of PENNZOIL would appoint an Administrative Committee which would act as the Plan Administrator and named fiduciary for ERISA purposes. The Administrative Committee was given the following discretionary grant:

(c) To interpret and construe all terms, provisions, conditions and limitations of this Plan and of any benefit program adopted hereunder ... as the Committee shall deem necessary and proper to effectuate the Plan and any benefit program adopted hereunder for the greatest benefit of all parties interested in the Plan;

*General powers of the Committee:* ... the determination of any fact by the Committee and the construction placed by the Committee upon the provisions of this Plan shall be binding upon all of the participants under this Plan, their beneficiaries and the employers.

8. On April 1, 2002, after the date of benefits termination but before MET LIFE issued its final decision terminating Plaintiff's entitlement to LTD benefits, the new Disability Benefits Plan Advice to Pay Administrative Service Agreement between PENNZOIL and MET LIFE ("2002 ASA") became effective. The ERISA functions of PENNZOIL and MET LIFE as described therein remained almost identical to those described in the previously implemented Plan documents. The 2002 ASA further defined MET LIFE's role as follows:

**Delegation of Authority**: PENNZOIL–QUAKER STATE COMPANY, Plan Administrator, and MET LIFE acknowledge that PENNZOIL–QUAKER STATE COMPANY has delegated to MET LIFE, and MET LIFE has agreed to assume the initial advisory authority for determining eligibility for disability benefits and for construing Plan terms subject to review by the Named ERISA claim review fiduciary. PENNZOIL–QUAKER STATE COMPANY assumes the responsibility and discretionary authority for approving or denying Plan benefits in whole or in part.

**Initial Claim Evaluation:** MET LIFE will conduct an initial advisory evaluation of claims to determine whether disability benefits are payable ....

**B. ERISA CLAIM REVIEW PROCEDURE**

PENNZOIL–QUAKER STATE COMPANY and MET LIFE acknowledge that PENNZOIL–QUAKER STATE COMPANY assume(s) responsibility and discretionary authority for providing the full and fair review of determinations concerning eligibility for Plan benefits and interpretation of Plan terms in connection with the appeal of claims denied in whole or in part. ... and, therefore, PENNZOIL–QUAKER STATE COMPANY is the named ERISA claims review fiduciary.

9. In terms of ERISA responsibilities, the 2002 ASA provides that PENNZOIL retains the ultimate responsibility and authority for approving or denying Plan benefits and that any determination made by MET LIFE pursuant to the ASA is "advisory and not an exercise of discretion with respect to ERISA." Although this is the

relationship as set out in the Plan documents, the parties dispute whether it was adhered to in practice. WALL refers to an email exchange between Bradley Savinoha of MET LIFE and Tyrone James of PENNZOIL. Therein MET LIFE's representative sought confirmation that it "will administer plan according to plan design and handle request for appeals" with PENNZOIL exercising its fiduciary authority "on an exception basis". PENNZOIL'S representative responded that MET LIFE "should review all information on initial claims filing and appeals" but that "all appeals are re-reviewed and if the decision by [MET LIFE] is still declination[, PENNZOIL] can over turn" pursuant to its "ultimate fiduciary responsibility." WALL contends that this email demonstrates that PENNZOIL played no meaningful role in the decision-making process while the Defendants contend that it only confirms PENNZOIL's role as the primary fiduciary.

10. The Plan defines "total disability" as follows:

> During the first twenty-four (24) months of disability (six (6) months on STD and eighteen (18) months on LTD), you are unable to perform the duties and responsibilities of your regular occupation. After the first twenty-four (24) months of disability, you must be unable to perform the duties of any occupation for which you are reasonably suited by training, experience or education.

11. Since the Plan paid WALL LTD benefits past the twenty-four (24) month period, the "any occupation" definition applied to the final benefit determination.

12. Plaintiff began working for PENNZOIL in 1971, in 1977 WALL underwent a hemilaminectomy and again in 1981 a three level bilateral laminectomy. In May 1990, at the age of 45, he was holding the position of "outside salesman" with PENNZOIL, when he suffered a herniated disk of the lumbosacral spine and as a result made a claim for LTD benefits. At the time, both the Plaintiff and his treating physician, Dr. Jamie Revollo, believed he would be able to perform some type of work in the future. In his LTD application, WALL states that he would be capable of performing other jobs such as "office management; telephone; written communication; inside sales provided short distances from employment; training others in skills I possess". In an initial Attending Physician Statement ("APS") dated November 14, 1990, Dr. Revollo stated that WALL could perform "clerical work" and checked "no" when asked if WALL was disabled from either his occupation or any occupation.

13. In February 1991, WALL applied for Social Security Disability Insurance ("SSDI") benefits, alleging that he had been disabled since May 23, 1990. His application was denied on March 7, 1991, and the Social Security Administration determined that his condition was not severe enough to keep him from working.

14. At this point, WALL had to meet the "regular occupation" definition of disability. Initially, MET LIFE determined that WALL did not meet that standard, and on May 12, 1992, it issued a denial to Plaintiff. However, contrary evidence supported Plaintiff's claim for benefits, including an APS from neurosurgeon Dr. Arnold Zeal; a revised APS by Dr. Revollo; an original vocational evaluation and addendum report performed by Crawford Health and Rehabilitation Services; a medical examination and subsequent reports by consultative examiner Dr. Norman; and psychiatric records provided by John Moreland, Ph.D.

15. After an appeal of the original denial by WALL, MET LIFE overturned its original denial and reinstated and approved WALL's claim for LTD benefits

effective June 1, 1992. WALL was advised that he would need to remain totally disabled pursuant to the Plan provisions to continue to receive LTD benefits.

16. In January of 1994, WALL reapplied for Social Security benefits. To receive benefits, WALL had to establish that he was disabled on or before March 31, 1996. WALL lost at all levels of this SSDI application, including the administrative hearing and a review by the Social Security Appeals Council. The ALJ's March 15, 1996, 12–page opinion affirmed the prior denials, found that WALL's testimony was "not fully credible," and that "his symptoms [were] not as limiting as alleged," and concluded that WALL had acquired work skills and the residual functional capacity to meet the requirements of semi-skilled functions of work other than his past employment. The ALJ noted that there were a significant number of jobs in the national economy which he could perform and evidence presented during the hearing indicated that during his alleged disability period, WALL was "able to engage in significant activity, including driving, shopping, wood crafts, reading and playing darts in a dart league" as well as "completing arrangements to get his business off the ground" and working "light duty at his hoagie shop".

17. MET LIFE continued to receive APS's asserting the permanency of his condition and his inability to work at any occupation. Dr. William Gogan became WALL's treating orthopedist in 1997, and during the subsequent years generated several medical reports regarding WALL's back problems and inability to return to work. Diagnoses included a C3–4 annular disc bulge, C5–6 and C6–7 broad disc herniations, post operative laminectomy syndrome, etc., and depression. A May 2001 MRI revealed bone contusion and tears in his left knee and right shoulder. Dr. Director, M.D., performed a consultative psychological examination and diagnosed depression associated with chronic pain and dysfunction associated with back and neck problems. WALL points out that these reports were not included in the administrative record.

18. In March 2001, MET LIFE requested medical information and an attending physician's statement from Dr. Gogan as well as an updated personal profile questionnaire.

19. In his response, WALL explained that he continued to suffer from severe lower back pain and severe generalized body pain. He described his typical day as consisting of sleeping, watching TV, getting in a jacuzzi, and intermittently using the computer. He further indicated that his driving habits had changed and were now limited to very short distances.

20. In August 2001, Dr. Gogan provided a full set of medical records and test results. On November 14, 2001, Dr. Gogan submitted an APS finding that WALL must completely avoid use of stairs/ladders, scaffolds/heights, reaching, pushing, pulling, twisting, climbing, balancing, bending, stooping, squatting, and operating equipment. He also advised that WALL should never lift or carry any weight during the day. Dr. Gogan indicated some limitation would be imposed on WALL in the areas of transportation, sitting, standing, position change, grasping and repetitive movement. Earlier in November 1999, Dr. Gogan noted that WALL's back and neck pain was "intractable" and that he was using a scooter.

21. MET LIFE obtained video surveillance of WALL recorded on October 12 and 13, 2001. The video showed WALL engaged in activities inconsistent with the limitations contained in Dr. Gogan's APS and his personal profile, including being active for a full 10–hour day, riding long distances in a vehicle, entering and exiting

the vehicle several times with ease, bending and reaching to retrieve items from the vehicle, standing for long periods, sitting for long periods, and walking and carrying boxes. WALL demonstrated no external signs of impairment or physical restrictions when performing these actions on the surveillance video. WALL contends that this video, recorded over the span of two days, showed only minimal activities such as riding as a passenger and occasionally fetching items from the truck for his son.

22. On December 12, 2001, MET LIFE sent the surveillance video to Dr. Gogan to solicit comments and any objective medical documentation that would support continued disability benefits in light of this new evidence. Dr. Gogan responded via correspondence dated January 14, 2002, indicating that he had "strong objections" to the use of surveillance videos and that he expected to be "compensated" for his review of the video if, in fact, he did review it. On February 12, 2002, MET LIFE responded to Dr. Gogan advising that they would "reasonably compensate" him for review of the surveillance video and further requesting the he respond within ten (10) days. Dr. Gogan provided no response in that time period.

23. On March 1, 2002, MET LIFE determined that WALL no longer met the PENNZOIL definition of disability which now required that WALL be disabled from "any occupation." WALL's entitlement to benefits was terminated effective February 28, 2002. PENNZOIL, through its representative, Loris Underwood, was provided a copy of MET LIFE's termination letter but took no action of its own.

24. WALL, who had been represented by counsel during most of the LTD administrative process, retained his third attorney, Joseph L. Manniko, who initiated an appeal of the benefit denial on April 25, 2002. Shortly after initiating the appeal,

WALL filed the subject suit against PENNZOIL. Plaintiff did not submit any additional information to MET LIFE during the course of the appeal.

25. MET LIFE requested that the claim be reviewed by an independent physician. On May 30, 2002, Jane T. St. Clair, M.D., who is Board Certified in occupational medicine, and a fellow of the American Academy of Disability Evaluating Physicians, performed a review of WALL's claim. She reviewed not only the more recent medical records submitted by Dr. Gogan in 2001, but all of the medical records (dating back to 1991) which were submitted during the entire administrative process, along with the surveillance video. Dr. St. Clair determined that as far back as 1999, there was nothing in the medical records to indicate that WALL's lumbar function had deteriorated. She found the surveillance video to be consistent with this finding since WALL did not demonstrate any functional problem with his hip or spine in the video. To the contrary, WALL's actions in the video "demonstrated the abilities to participate in a fitness program and to perform sales related functions." Dr. St. Clair found that WALL had work capabilities in the sedentary to light range and that there were many job possibilities within his functional capacity.

26. On June 12, 2002, MET LIFE upheld its original denial in a letter to Mr. Manniko, WALL's attorney, MET LIFE again provided Loris Underwood of PENNZOIL with a copy of this letter, and PENNZOIL tacitly accepted MET LIFE's decision terminating WALL's continued entitlement to LTD benefits. On July 15, 2002, after the final benefit decision was rendered, and seven (7) months after its original request that the video be reviewed, Dr. Gogan finally advised MET LIFE (through Mr. Manniko) that he

would review the surveillance video upon receiving a $500 advance payment.

27. On March 4, 2003, this Court entered its Order of Judicial Notice of all proceedings in the case of *Albert C. Wall v. Pennzoil Co.*, Case No. 95–14296–CIV–RYSKAMP. That lawsuit concerned a dispute between WALL and PENNZOIL as to the computation of PENNZOIL's setoff against WALL's worker's compensation benefits. On April 11, 2003, the parties settled, and PENNZOIL agreed to hold constant its set off calculation formula for as long as WALL continued to receive LTD benefits.

### *DISCUSSION*

28. The threshold issue before this Court is the appropriate standard of review by which to adjudge the correctness of the Plan Administrator's decision. Because the Plan conveys discretionary authority upon it to determine benefits eligibility, judicial de novo review is not appropriate, and the decision is entitled instead to the deferential arbitrary and capricious standard. If the Administrator operated under a conflict of interest, a "heightened" arbitrary and capricious standard of review would be warranted. *See Shaw v. Connecticut General Life Ins. Co.*, 353 F.3d 1276, 1281–82 (11th Cir.2003). This standard applies equally to questions of plan interpretation or fact, *see Torres v. Pittston Co.*, 346 F.3d 1324, 1332 (11th Cir.2003), as well as to mixed questions of interpretation and fact, *see Shaw, supra*, at 1285 (finding that the question of whether a claimant is "totally disabled" involves both considerations). WALL agrees that this is the applicable standard of review and that the Plan documents name PENNZOIL as the Plan Administrator and fiduciary. However WALL contends that MET LIFE was the de facto decision-maker (and therefore the true fiduciary), and because the Plan does not convey its

grant of discretionary authority upon it, its decision is not entitled to any deference upon judicial review.

29. It is true that PENNZOIL played only an observational role in the processing of WALL's claim. MET LIFE reviewed the record evidence, reached both initial and appellate decisions, rendered those decisions with binding effect, and notified WALL of them. While a second level of appellate review before PENNZOIL was available, WALL apparently chose not to pursue it, and while a right of intervention and veto power existed, PENNZOIL chose not to exercise it. Nonetheless the Plan documents do identify PENNZOIL as holding ultimate responsibility over the Plan and the provision of benefits thereunder. The law recognizes this arrangement as valid for ERISA purposes, and thus, this Court finds that MET LIFE is not the Plan fiduciary and consequently that it is not the proper party defendant to this lawsuit. *See Garren v. John Hancock Mutual Life Ins. Co.*, 114 F.3d 186 (11th Cir.1997) (finding that a claims administrator is not a proper party defendant when the claims administrator lacked discretionary authority over the Plan and exclusive responsibility for the Plan resided with the employer), *Bowman v. Continental Cas. Co.*, 1999 WL 118001, *3 (D.Conn.1999) ("[A] claims administrator without the final discretionary authority is not a proper defendant to be held liable for a plan fiduciary's ERISA violation.") As the party vested with ultimate responsibility over the Plan, PENNZOIL is liable for any errors committed by MET LIFE in the decision-making process. By bifurcating Plan responsibility from the decision-making process, this arrangement might conceivably render the decision-maker immune from any conflict-of-interest review, but because in this instance the Administrator

funds the Plan, this is not an issue. Rather, by placing the claims processing in another's hands, the Administrator avoids the possibility of a decision tainted by self-interest.

30. The abuse of discretion standard also informs this Court's selection of the proper standard for reviewing the parties' motions for summary judgment. As explained in the case of *Goodman v. S & A Restaurant Corp.*, 821 F.Supp. 1139, 1145 (S.D.Miss.1993), the pertinent issue is not whether the Plaintiff is, in fact, no longer disabled, but rather whether the Administrator abused its discretion in finding that the Plaintiff was no longer disabled. In order to prevail, WALL must therefore demonstrate that in reaching its decision to deny benefits, the decision-maker acted with partiality or without any substantial basis. In reviewing that decision, this Court is limited to the record that existed at the time the final decision was made, *see Parness v. Metropolitan Life Ins. Co.*, 291 F.Supp.2d 1347, 1355–56 (S.D.Fla.2003), i.e., on June 12, 2002 when MET LIFE upheld its original denial.

■ 31. This Court finds that PENN-ZOIL's decision to deny LTD benefits to WALL was reasonable and based on evidence in the record and must be upheld under the arbitrary and capricious standard. The supporting evidence includes, but is not limited to the following:

(a) During WALL's claim for LTD benefits from PENNZOIL, WALL applied for SSDI benefits. To receive benefits, WALL had to establish that he was totally disabled from any occupation as of March 31, 1996. WALL lost at all levels of this SSDI application including the administrative hearing and the review by the Appeals Council. The ALJ found that WALL's testimony was "not fully credible" and concluded that WALL had acquired work skills and the residual functional capacity to meet the requirements of semi-skilled functions of work other than his past employment. The ALJ further noted that there were a significant number of jobs in the national economy which he could perform and found that WALL was not disabled at any time through the date of his decision. Consistent with this decision, evidence before the Social Security Administration indicated that during the alleged period of disability, WALL was trying to "get a business off the ground" and "continue light-duty work at his hoagie shop."

(b) Video surveillance of WALL showed him engaged in activities inconsistent with the limitations WALL described and those imposed by his physician, Dr. Gogan. The video showed WALL out and active for a whole day from 9:45 a.m. to 7 p.m., riding long distances in a truck, entering and exiting the truck with ease, bending and reaching to retrieve items from the truck, standing and sitting for long periods and walking and carrying boxes. At no time did WALL show external signs of impairment or physical restrictions when performing these actions. Dr. Gogan was asked to review and comment on this video, but refused to coordinate such review in a timely fashion.

(c) Dr. Gogan's own medical records indicate that WALL's self-described physical limitations were not accurate. WALL was described as performing yard work, regularly playing darts in a competitive league, and riding a motorcycle.

(d) An independent physician, Jane T. St. Clair, M.D. who is board certified in occupational medicine and a fellow of the American Academy of Disability Evaluating Physicians, extensively reviewed all the medical records and other documentation submitted by WALL in support of his LTD claim. Dr. St. Clair

1178

determined that WALL has work capabilities in the sedentary to light range and that there are many job possibilities within his functional capacity.

32. This Court finds that there is nothing within the record to suggest that a contract was entered into between WALL and PENNZOIL that prohibited PENNZOIL from terminating WALL's disability benefits if he were no longer disabled. Merely because WALL and PENNZOIL agreed in 1996 that the calculation of WALL's disability benefits would not be changed in the future does not mean that WALL's benefits could not be terminated in the absence of WALL showing proof of continuing disability.

**ACCORDINGLY**, this Court recommends to the District Court that Defendant MET LIFE's Motion for Summary Judgment and Defendants PENNZOIL and its Employees Disability Benefit Plan's Motion for Summary Judgment be **GRANTED** and that Plaintiff WALL's Motion for Summary Judgment be **DENIED**. Consequently, Count I of the Second Amended Complaint (for ERISA benefits) should be granted in favor of all Defendants and Count II of the Second Amended Complaint (for breach of settlement agreement) should be granted in favor of PENNZOIL, such that the instant action is dismissed in its entirety.

The parties shall have ten (10) days from the date of this Report and Recommendation within which to file objections, if any, with the Honorable James C. Paine, United States District Judge assigned to this case.